**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| **IGOR O. TOVSTANOVSKY** | **)** | |
| **AND YELENA TOVSTANOVSKY,** | **)** | **Case No.: 26-04966** |
| | **)** | **Chapter 11** |
| **Debtor.** | **)** | |

**STELLANTIS FINANCIAL SERVICES, INC.'S REPLY TO DEBTORS' COMBINED RESPONSE TO MOTION OF FORD MOTOR CREDIT COMPANY, LLC TO DETERMINE DEBTOR'S INELIGIBILITY TO PROCEED UNDER SUBCHAPTER V OF CHAPTER 11 AND THE JOINDER OF STELLANTIS FINANCIAL SERVICES, INC. TO SUCH MOTION**

Stellantis Financial Services, Inc. ("SFS") files this reply to briefly address issues raised in Debtors Igor and Yelena Tovstanovsky ("Debtors") Combined Response to SFS's Joinder and Ford Motor Credit Company, LLC's ("FMCC") Motion to Determine Debtors' Ineligibility to Proceed Under Subchapter V. Debtors challenge the mere existence of SFS's joinder (Dkt. 63) to the FMCC Motion (Dkt. 60) and allege facts that are simply inaccurate. SFS is compelled to respond accordingly.

**I. Debtors' Response is factually inaccurate.**

Pursuant to Sections 101 and 1182 of the Bankruptcy Code, a "small business debtor" is defined as one which (as of the date of the filing of the petition) has less than an aggregate amount of no more than $3,424,000 in noncontingent liquidated secured or unsecured debts. The burden of proving that a debtor qualifies as a small business debtor is on the party claiming eligibility—here, the Debtors. *See, e.g., In re RS Air LLC,* 638 B.R. 403 (9th Cir. BAP 2022); *In re Sullivan*, 626 B.R. 326, 330 (Bankr. D. Colo. 2021).

Debtors go to great lengths describing to the court what qualifies as a liquidated debt, and what qualifies as a contingent debt. The term "liquidated" is not defined in the Bankruptcy Code. However, those courts that have considered the issue have generally agreed that to be a

"liquidated" debt, it must be a debt that has ready determination and precision in computation of the amount due—that is, it must be a debt that is capable of mathematical computation. *Matter of Pearson*, 773 F. 2d 751, 754 (6th Cir., 1985); *In re Adams*, 373 B.R. 116, 120 (10th Cir. BAP 2007). A debt is contingent if all of the events giving rise to the debtor's liability occurred prior to the debtor filing their bankruptcy petition. *See, e.g., Matter of Knight*, 55 F. 3d 231, 236 (7th Cir. 1995) ("In broad terms, the concept of contingency involves the nature or origin of liability. More precisely, it relates to the time or circumstances under which the liability arises.").

Debtors' argument is threefold. First, Debtors claim that their debts to FMCC and SFS were both unliquidated, because they allegedly surrendered their collateral to FMCC and SFS in March 2026. Second, Debtors claim that their debts to FMCC and SFS are contingent, although they fail to provide any argument as to why. And third, Debtors claim that they "paid" their debts to FMCC and SFS by "surrendering the vehicle collateral to them." All three arguments are inaccurate. Further, Debtors' "analysis" of the value of SFS's recovered collateral is misleading and inaccurate. SFS addresses each issue in turn.

*A. The SFS claim was liquidated.*

SFS's claim against Debtors was liquidated well before the petition date in this case. The Court need only reference Exhibit C to SFS's proof of claim (the "Proof of Claim," Claim 7, Proof of Claim Register). Therein, on February 20, 2026, a letter addressed to SFS's borrower, Sky Auto Mall LLC ("Sky"), and by carbon copy to Debtors and Alex Tovstanovsky informed them of the specific amount due and owing on the obligations under the Master Loan and Security Agreement and their guaranties ($12,330,953.68), and demanded payment of the same. Declaration of Patrick Russell, ¶ 12, attached as Exhibit A. The amount set forth in that letter is consistent with the amount of SFS's claim in this case—over the course of the following month, before the petition was filed in this case, SFS's costs and the interest accruing on the loan and guaranties had increased, by a little less than $100,000. Declaration of Patrick Russell, ¶ 15.

Debtors argue this amount was not truly liquidated, because if they had come to SFS with cash to pay off their debts, SFS would not have been able to tell them how much they owed. **This is false**. SFS would have known what the debt that Debtors owed was, because it could be calculated. SFS's ongoing replevin action for its vehicle collateral would not have changed the amounts due[1]; instead, SFS would have simply accepted payment, abandoned its efforts at replevin and allowed Sky to sell SFS's collateral as it chose—because SFS would have been paid off fully on the collateral at that point, and would have had no further interest in the collateral. Declaration of Patrick Russell, ¶ 18. Because SFS's claim was capable of being mathematically calculated, it was liquidated.

*B. The debt owed to SFS was not contingent.*

In order for a debt to be considered noncontingent, all of the events giving rise to the debt must have occurred before the filing of the bankruptcy petition. All of the debts at issue in this case accrued before the filing of Debtors' petition. Before Debtors filed their petition, SFS filed two lawsuits against the debtors—and in each, claimed the same amount, $12,330,953.68, as the amount due and owing. *See* Declaration of Patrick Russell, ¶ 14. Those lawsuits were both filed on March 2, 2026, **18 days** before Debtors filed their petition in this case. SFS's proof of claim for the amount due and owing as of the petition date in this case scarcely changed that amount. Second, SFS sent Debtors a demand letter seeking the same amount on February 20, 2026. Exhibit C to SFS Proof of Claim; Declaration of Patrick Russell, ¶ 12. While a guaranty can be a form of "contingent" debt, debt owed on a personal guaranty can be noncontingent. Bankruptcy courts in this state have held as much. "In Illinois, the law is clear that a guarantor's obligation to pay is not triggered until there has been a default by the primary obligor, either because the primary obligor has failed to pay the debt at its maturity, or because the debt has otherwise come

[1] As SFS explains more fully below, Debtors' amorphously inaccurate replevin timeline undermines their entire argument on this point.

due on account of a default of the primary obligor. Thus, a claim based on a guaranty is contingent unless the loan is in default." *In re Benanti*, 2018 WL 1801194, *6 (Bankr. C.D. Ill. 2018) (internal quotations and citations omitted). Here, the loan guarantied by Debtors was in default as of February 20, 2026, and that default continues to this day.[2] Once the loan went into default, the debt on the guaranties went from being contingent to noncontingent under Illinois law. Debtors provide no argument to the contrary. The debts they owed SFS were not contingent.

*C. The Debtors paid SFS nothing.*

The Debtors hang much of their argument on their false narrative that they "paid" their debts to SFS. The Debtors have paid, quite literally, nothing to SFS on their guaranties, despite their promise to do so. Debtors' Response repeatedly suggests that they made some payment to SFS, but the only alleged "payment" of the debt they identify was allegedly surrendering collateral to SFS. This tortures the English language and is inaccurate in any event.

Debtors' argument is that providing collateral is the same thing as payment. This argument is contrary to their agreements. A "payment" is made in cash—in fact, the MLSA required payment in U.S. Dollars explicitly. *See* Exhibit A to SFS Proof of Claim, Section 1.11. Debtors' guaranty required them to make payment of all amounts owed under the MLSA, which obligation was "if and when Lender makes demand on Guarantor, Guarantor will immediately **pay** [SFS] all amounts Guarantor may owe [SFS] under this Guaranty." *See* Exhibit B to SFS Proof of Claim, Section 3. The Guaranty separately addresses the possibility of SFS's collateral being recovered and sold, indicating the recovery of collateral is not co-extensive with payment. *See* Exhibit B to SFS Proof of Claim, Section 16. Recovering collateral is simply not the same thing as making a "payment."

[2] The debtor on the guarantied loan, Sky Auto Mall LLC, did not itself declare for bankruptcy, and remains in default of its obligations under the terms of the MLSA. Those defaults include, but are not limited to, failure to make payments when required by the MLSA; allowing additional liens to be placed on SFS's collateral through double flooring of SFS collateral; selling vehicles out of trust; defaults in respect of other creditors; a material

Further, Debtors misrepresent the timeline of actions in this case. Debtors (accurately) say SFS took control of "keys and titles" to vehicles on or about February 24, 2026. This language in the declaration is important— because as between SFS and FMCC, Debtors' declarant swore that FMCC took possession of, among other things, the dealer's "vehicle inventory (both new and used)." (Ex. A to Opposition, ¶ 9). For SFS, the declarant stated that SFS took possession only of "keys and titles." *Id.* at ¶ 12. These allegations are different, and the distinction indicates that even Debtors acknowledge that SFS did not have possession of its vehicle collateral.

SFS acknowledges that, upon discovering that Debtors and their company had allowed unprecedented levels of out of trust sales and double flooring of vehicles to occur, it also required that an SFS representative be on site to control the disposition of its collateral by Sky. However, the vehicles themselves were never voluntarily surrendered to SFS. For a period of time in late February 2024, in fact, and after SFS took possession of the keys and titles, Sky continued to sell vehicles, the proceeds of which were paid to SFS as required by the MLSA. *See* Declaration of Patrick Russell, ¶ 19. Amazingly, to date despite repeated efforts to obtain access to and cooperation from Debtors and Sky to recover and sell parts and equipment on site, Debtors and Sky have failed and refused to do so, costing SFS hundreds of thousands of dollars in potential recoveries, as well. Declaration of Patrick Russell, ¶ 20.

SFS did file a state court lawsuit in Linn County, Iowa for replevin on March 2, 2026, as Debtors suggest. But SFS did not have a hearing or entry of an order of replevin until **March 20, 2026**—something Debtors should well know, because their counsel contacted SFS less than an hour before the replevin hearing to notify SFS that Debtors and their son had filed for bankruptcy protection. *See* March 20, 2026 1:54 PM central time email from counsel, attached as Exhibit B

adverse change in the borrower's financial condition; termination of the debtor's franchise, as approved by this Court; creditor proceedings by another creditor; and general insecurity in regard to the loans owed to SFS.

hereto. Indeed, SFS voluntarily dismissed Debtors from the lawsuit on March 20, 2026 for the express purpose of providing certainty that the entry of a replevin order would not violate the automatic stay in this bankruptcy. *See* Declaration of Patrick Russell, ¶ 21. The order granting SFS's request for replevin was entered on March 23, 2026 and the writ of replevin itself was not entered until March 25, 2026, **five days after** the filing of the bankruptcy petition in this case. *See* Replevin Order and Writ, attached hereto as Exhibit C.

Debtors' statement that "replevin orders in the Replevin Actions were entered around the first week of March 2026," then, is false. SFS did not have a legal order granting it possession of its collateral until *after* the filing of the petition in this case, meaning that as of the petition date, Debtors and Sky retained exclusive ownership of the collateral. And, contrary to Debtors' position in their Response, no one ever provided an unconditional surrender of SFS's vehicle collateral. Declaration of Patrick Russell, ¶ 17. SFS did not have the right or ability to begin liquidating its collateral prior to receipt of the replevin order—and SFS did not take any steps to remove vehicles from the Sky dealership lot or sell collateral until after that order was entered. *Id*. Thus, as of the date of the petition being filed in this case, SFS did not have possession or the right to sell its collateral. This is fatal to Debtors' position. Debtors carry the burden of showing that their debts were less than $3,424,000 on their petition date, and they fail to do so.

*D. Debtors' value analysis is inaccurate.*

Finally, even if Debtors' factual and legal analysis of the natures of their debts was correct (which it is not), their value "analysis" is a complete misread of reality. Debtors' value "analysis" was conducted by Alex Tovstanovsky, their son, and relied on 1) SFS recovering every vehicle listed on the list Mr. Tovstanovsky prepared,; 2) SFS being able to obtain full Kelley Blue Book values for every vehicle it did recover; and 3) no vehicles being double floored or sold out of trust. All of these presumptions proved untrue.

First, SFS did not recover all vehicles on the list attached to Debtors' response as Exhibit C. Declaration of Patrick Russell, ¶ 23. The total number of vehicles SFS ultimately recovered from Sky Auto Mall was 196 vehicles, only 194 of which were included on Exhibit C (SFS recovered two vehicles not on Exhibit C). *Id.* The list attached as Exhibit C appears to be 283 vehicles in length. *Id.* This represents a difference of at least 89 vehicles between what Debtors suggest SFS recovered, and what SFS actually recovered. This is just over a 31% reduction in the number of vehicles recovered from what Debtors believe SFS recovered. If the total percentage of value that Debtors claim SFS recovered from vehicle sales was spread equally across the entirety of the valuation they placed on the vehicles, the value of those vehicles is reduced from Debtors' calculation of $13,082,380.00 to $8,968,133.29—a reduction of $4,114,246.71, and (if completely accurate) would still leave Debtors owing SFS at least $3,463,712.91[3]--by itself, a number larger than the Subchapter V limit. Debtors' failure to accurately identify the vehicles that SFS actually recovered, rather than just those that SFS floored for Sky, also reduces the value of the collateral that SFS recovered well below the amount due and owing from Debtors.

Second, Debtors' "analysis" simply assumes that SFS would recover the entirety of the value of these vehicles (likely the retail value, rather than wholesale value that SFS might actually be able to recover) as allegedly reflected by Kelley Blue Book at some unspecified point in time. SFS questions whether the Kelley Blue Book values reflected in Debtors' chart are accurate, but even if they are, this "analysis" fails to account for the fact that for virtually every new vehicle floored at Sky Auto Mall by SFS, Sky Auto Mall retained all of the dealer incentives and holdbacks—thereby immediately reducing the potential resale value to other dealers for those same vehicles. Declaration of Patrick Russell, ¶ 24. Exhibit C also fails to account for the

---

[3] As set forth more fully below, SFS is able to identify the specific difference in values between the vehicles that Debtors claim SFS recovered and those that SFS actually recovered. But, because Debtors carry the burden of proving their entitlement to file under Subchapter V, a simple proportional reduction in overall value amply demonstrates that SFS had substantial unpaid debt from Debtors.

substantial costs of transport to get the vehicles to new locations for sale, whether other dealers or auctions. *Id.* Further, a substantial number of the "new" vehicles had more than 500 miles on them and thus could not be sold at auction or to other dealers as "new," and a number of the "new" vehicles were 2025 model year, and thus had depreciated in value. *Id.*

SFS provided notice to Debtors on March 27, 2026 of their intention to sell the collateral recovered from Sky Auto Mall. Declaration of Patrick Russell, ¶ 25. SFS has successfully sold a large majority of the vehicles it recovered, with only 17 of the 196 vehicles remaining to be sold. Declaration of Patrick Russell, ¶ 26. The total proceeds of sale are $7,902,499.34, representing a loss of $634,840.96 against the amount of the floorplan loans extended to purchase those vehicles. *Id.* Thus, the amount currently due and owing to SFS from Sky is well over $3,424,000.00.[4]

But the amount due and owing **now** is irrelevant to determination of FMCC's Motion, because the amount that matters for purposes of this analysis is whether the debts owed by the Debtors **as of the filing date** were greater than $3,424,000.00. They clearly were. As of the petition date Debtors owed SFS itself more than $3,424,000.00, and it is clear that Debtors owed SFS and all of their other creditors far more than that amount in the aggregate. The calculation of remains due and owing to SFS today only buttresses that the original debt was far larger than the subchapter V limit.

The other issues that Debtors' lists and arguments ignore are, in some ways, more pernicious than the issues outlined above. Specifically, and somewhat remarkably, Debtors' lists of vehicles that they "surrendered" to FMCC and SFS include a number of vehicles that appear ***on both lists*** (Exhibits B and C to Debtors' Opposition). This, presumably, is because these vehicles were all floored with both lenders simultaneously—the genesis of much of the problems

that led to the filing of these bankruptcies. In so doing, Debtors are representing to the Court that they somehow surrendered the same vehicle to both lenders, and that the sale of that vehicle to a third party was somehow providing value to both lenders, as well. This, of course, is not possible. Both parties cannot simultaneously have possession of the same vehicle, and both parties cannot sell the vehicle for full price. Only one can possess the vehicle, and only one can sell it. Further, Debtors' analysis includes a number of vehicles that SFS never recovered from Sky—and, again, that means that SFS never had the ability to sell or recover proceeds from the sale of those vehicles, either.

Based on SFS's analysis of the list attached as Exhibit C to Debtor's Opposition, and a comparison to SFS's analysis of Exhibit B to Debtor's Opposition, as well as the vehicles actually recovered by SFS, the following is true:

- Exhibit C contains 74 vehicles which also appear on Exhibit B, representing a total alleged Kelley Blue Book value of $3,722,141.

- Of those 74 vehicles, SFS ended up with possession of only 32 of the vehicles, with a total alleged Kelley Blue Book value of $1,618,005—or $2,104,136 less than the value attributed as recoverable by SFS.

- Further, there were an additional 43 vehicles Debtors allege they "surrendered" to SFS that were never in SFS's possession (presumably, vehicles that Sky Auto Mall floored with SFS, but that were sold out of trust). The total alleged Kelley Blue Book value of those vehicles was $1,394,293.

- Attributing all of the Kelley Blue Book values to the vehicles not actually recovered by SFS reduces the alleged recovery value by $3,498,429. Thus, even if SFS was able to recover the full Kelley Blue Book value of the vehicles it actually obtained possession of (which it never would under the circumstances, due to the factors listed above—retained incentives and holdbacks by the dealer, new model year 2025 vehicles being counted as "new," and "new" vehicles with more than 500 miles on them), the reduction in amount of SFS's alleged recovery was greater than the subchapter V threshold.

---

[4] SFS anticipates filing an amended proof of claim in this case when all vehicles have sold, rather than serially filing amended proofs of claim after the sale of each vehicle or set of vehicles. SFS still has 21 vehicles left to sell, at which time it will amend its proof of claim.

Declaration of Patrick Russell, ¶ 27-29. Thus, using Debtors' own numbers combined with the reality of the actual vehicles that SFS actually recovered, the most that SFS might realistically hope to recover from sales of recovered collateral would have been $9,583,953—and of the units already sold, SFS has taken a loss of $634,840.96 against the floorplan balance on those units, leaving the possibility of recovery of that maximum amount virtually impossible. *Id.* at ¶ 26. SFS's loss on existing sales directly contrasts with Debtors' estimate that the value of SFS's allegedly recoverable collateral was $751,426.32 greater than the value of SFS's floorplan advances.

Debtors' failure to determine whether the list of vehicles they allege they turned over to FMCC and SFS contained dozens of duplications renders the entirety of their "analysis" suspect, and the belief that SFS could recover vehicles sold out of trust is also suspect. At bottom, Debtors carry the burden of proving their debts are below the Subchapter V threshold. While actual sales amounts will ultimately determine the amount of SFS's amended claim in this case, Debtors' estimate of the value of the collateral that SFS recovered in its replevin action is massively overstated in the Opposition. Debtors "analysis" does not help them carry their burden.

**II. SFS's joinder was appropriate.**

Debtors also challenge whether SFS had the ability to file a joinder to FMCC's Motion. Debtors argue that SFS's joinder to FMCC's Motion is untimely based on Bankruptcy Rules 1020 and 9014, and that as a result, SFS's joinder should be "denied" by the Court.

SFS's intention in filing its joinder to the FMCC Motion was simple—FMCC initially filed its Motion before SFS had filed its proof of claim in this case, and before an additional several million dollars' worth of other proofs of claim were filed, as well. These additional claims bore directly on the issues raised in the FMCC Motion, and would not have been ascertainable at the time that FMCC filed its Motion. In its joinder, SFS did not substantively

argue anything other than noting these additional claims and amounts. SFS had no intention of circumventing procedural requirements in doing so, and to the extent that SFS failed to file its joinder timely, the error was inadvertent and caused no prejudice to any party.

The Supreme Court has, in the context of Federal Rule of Bankruptcy Procedure 9006, determined that "excusable neglect" sufficient to allow a late filing of a document in bankruptcy court to include, among other things, "inadvertence, mistake, or carelessness." *See Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S 380, 388 (1993). SFS's failure to timely file its joinder to the FMCC Motion, if it was late, was a matter of inadvertence. SFS's intended not to file any reply on this motion until it realized the degree to which Debtors overstated the number of vehicles which were recovered by SFS, and that the "analysis" presented by Debtors included vehicles floored by both FMCC and SFS. Given the amounts of the additional proofs of claim filed after FMCC filed its Motion, SFS believes that good cause existed for its joinder, and to the extent that SFS's motion was filed late, SFS now requests that the Court consider the late filing to have been the result of excusable neglect, and to consider the arguments raised therein and in this reply accordingly.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in FMCC's Motion to Determine Debtors' Eligibility to Proceed under Subchapter V of Chapter 11 and SFS's Joinder thereto, SFS prays that the Court find that Debtors are ineligible to proceed under Subchapter V and that Debtors' bankruptcy be converted to a Chapter 11.

RESPECTFULLY SUBMITTED,

*/s/ Justin M. Nichols*
John T. Coghlan, MO Bar#36361
Justin M. Nichols, MO Bar#56920
Kutak Rock LLP
2405 Grand Blvd., Suite 600
Kansas City, MO 64108
John.Coghlan@kutakrock.com
Justin.Nichols@kutakrock.com
**ATTORNEYS FOR STELLANTIS FINANCIAL SERVICES, INC.**

**CERTIFICATE OF SERVICE**

The undersigned certifies that he caused to be served a true and correct copy of foregoing ***Stellantis Financial Services, Inc.'s Reply To Debtors' Combined Response To Motion Of Ford Motor Credit Company, LLC To Determine Debtor's Ineligibility To Proceed Under Subchapter V Of Chapter 11 And The Joinder Of Stellantis Financial Services, Inc. To Such Motion*** via the Court's Electronic Filing System (ECF) or as otherwise indicated on this 11th day of August 11, 2026.

*/s/ Justin M. Nichols*
An Attorney for Stellantis Financial Services, Inc.

**SERVICE LIST**

**Electronic Mail Notice List (via ECF)**

Adam Brief, ustpregionll.es.ecf@usdoj.gov
Janice H. Seyedin, jseyedin@janiceseyedininc.com, Jseyedin@ecf.axosfs.com
David K. Welch, dwelch@burkelaw.com
Brian P. Welch, bwelch@burkelaw.com
Madelein J. Coate, mcoate@burkelaw.com
Bradley R. Kruse, bkruse@dickinsonbradshaw.com
Alyssa Russell, arussell@phillipslytle.com
Joy Pinta, jpinta@jacobsandpinta.com
Konstantine Sparagis, gus@konstantinelaw.com
Craig A. Leslie, cleslie@phillipslytle.com
Angela Z. Miller, amiller@phillipslytle.com
David Alexander Darcy, adarcy@darcydevassy.com
Briley Vansadia, bvansadia@darcydevassy.com

**Manual Notice List (via U.S. Mail)**

Yelena Tovstanovsky
4127 Easy Circle
Naperville, IL 60564-4431

Igor Tovstanovsky
4127 Easy Circle
Naperville, IL 60564-4431